IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Marina PDR Operations, LLC

    **Plaintiff,**

      v.

MASTER Link Corp., Inc.; M/V
Master Link I, *in rem*

    **Defendants,**

**CIVIL NO. 17-1307 (RAM)**

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is Defendant Master Link Corp.'s *Motion for Summary Judgment* and Plaintiff Marina PDR Operations, LLC's *Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof* ("*Motion for Partial Summary Judgment*"). (Docket Nos. 80-83). Having considered the parties' submissions, the Court **DENIES** Defendant's *Motion for Summary Judgment* (Docket Nos. 80 and 81) and **GRANTS** Plaintiff's *Motion for Partial Summary Judgment* (Docket Nos. 82 and 83).

### I.  PROCEDURAL BACKGROUND

    On August 30, 2017, Plaintiff Marina PDR Operations, LLC ("Plaintiff" or "Marina PDR") filed a *Third Amended Complaint* (the "*Complaint*") against Defendants Master Link Corp. ("Defendant" or "Master Link" or "ML") and M/V MASTER LINK I ("MASTER LINK I"), *in rem*. (Docket No. 47 at 5-6). Marina PDR is the operator of the

Puerto Rico Del Rey Marina in Fajardo, Puerto Rico, providing wet slip and land storage for vessels of various sizes. Id. ¶ 4. ML's business consists of providing repair and maintenance services to vessels. Id. ¶ 5. ML had a contract with the Commonwealth of Puerto Rico's Maritime Transportation Authority ("MTA"), a public corporation which was "created to provide ocean transportation of cargo and passengers between mainland Puerto Rico and the municipalities of Vieques and Culebra." Id ¶ 6. The contract, which expired on November 4, 2012, was a Puerto Rico General Services Administration ("GSA") contract for repair services for M/V FAJARDO II ("FAJARDO II"). (Docket No. 81-5 at 6; 81-9 at 2). ML also had a contract with the marina's previous owner Puerto del Rey, Inc. ("PDR") for the repair of MASTER LINK I. (Docket No. 81-2).

Per the *Complaint*, ML allegedly breached both contracts. (Docket No. 47 at 3-4). Thus, Marina PDR claimed ML owes it $115,292.04 in unpaid fees and taxes for FAJARDO II and MASTER LINK I. Id. at 5. In the alternative, Marina PDR requested that MTA be held liable for $78,311.85 for overdue payments because it is the owner of FAJARDO II and original signatory to a Boat Space License Agreement ("BSLA") with the marina's previous owner PDR. Id. at 6. On June 26, 2018, Plaintiff and MTA filed a Settlement Agreement dismissing the claim against the latter. (Docket No. 64). Partial judgment was entered accordingly. (Docket No. 66).

On November 15, 2018, ML filed a *Motion for Summary Judgment* ("MSJ") and a *Statement of Material Facts in Support of Defendant's Motion for Summary Judgment* ("SUMF"). (Docket Nos. 80 and 81). It alleges that: 1) Marina PDR lacks standing to sue; 2) ML did not become indebted to Marina PDR under the contract between MTA and PDR concerning FAJARDO II because the assumption of debt and novation doctrines are inapplicable, and 3) Marina PDR cannot recover twice on the same claim. Id. Plaintiff opposed the MSJ and propounded additional facts ("Opposition to MSJ"). (Docket Nos. 88 and 88-1). Plaintiff's *Opposition to MSJ* is currently unopposed.

On November 15, 2018, Marina PDR filed a *Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof* ("PMSJ") and a *Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* ("PSUMF"). (Docket Nos. 82 and 83). It alleges that partial summary judgment is proper because there is no genuine issue regarding the amount due by ML for the storage of MASTER LINK I. (Docket No. 82 at 5-8). ML opposed the same ("Opposition to PSUMF") and Marina PDR replied. (Docket Nos. 86-87 and 93).

## II.  LEGAL STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving

party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The movant "bears the burden of showing the absence of a genuine issue of material fact." United States Dep't of Agric. v. Morales-Quinones, 2020 WL 1126165, at *1 (D.P.R. 2020) (citation omitted). The non-movant may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted). **"On issues of motive and intent, essential elements of novation, trial courts are to observe a 'cautious approach' upon evaluating summary judgment motions."** Jorge Rivera Surillo & Co. v. Cerro Copper Prod. Co., 885 F. Supp. 358, 363 (D.P.R. 1995) (citation omitted). The United States Supreme Court has also held that summary judgment is to be issued "sparingly" in litigation "where motive and intent play leading roles." Poller v. Columbia Broad. Sys., 369 U.S. 470, 473 (1962); *see also* Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (finding that "determinations of motive and intent ... are questions better suited for the jury"). Yet, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving

party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Roman-Basora v. Potter, 2010 WL 5677118, at *3 (D.P.R. 2010) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a nonmoving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Id. Local rules "are designed to function as a means of 'focusing a district court's attention on what is and what is not genuinely controverted.'" Marcano-Martinez v. Cooperativa de Seguros Multiples de Puerto Rico, 2020 WL 603926, at *2 (D.P.R. 2020) (quotation omitted). Lastly, the First Circuit has stated that adequately supported facts "shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted).

### III. FINDINGS OF FACT

After analyzing ML's SUMF (Docket No. 81), Marina PDR's unopposed additional uncontested facts (Docket No. 88-1) and ML's PSUMF (Docket No. 83), and **only crediting material facts** that are **properly supported by a record citation and uncontroverted**, the Court makes the following findings of facts:[1]

---

[1] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ _).

1. Plaintiff Marina PDR is a limited liability company created under the laws of the state of Delaware on May 22, 2013. (Docket No. 81 ¶ 5).

2. Marina PDR was registered in the Puerto Rico Department of State and authorized to do business as a foreign entity on September 5, 2013. Id. ¶ 6.

3. Marina PDR operates a marina in Fajardo, providing wet slip and land storage services for vessels of different sizes. (Docket No. 47 ¶ 4).

4. FAJARDO II and MASTER LINK I are currently being stored in Marina PDR's marina in Fajardo. (Docket Nos. 81 ¶¶ 10, 13; 83 ¶ 1; 88-1 ¶ 1).

5. Defendant Master Link is a corporation organized under the laws of the Commonwealth of Puerto Rico providing repair and maintenance services to vessels. (Docket No. 47 ¶ 5).

6. *In rem* defendant Master Link I is a custom-made barge, 90 feet in length, fabricated in 1987, with Hull Identification Number (HIN) MMV10401135208, and Documentation or Registration Number DC-1234918. Id. ¶ 7.

7. Master Link I is owned by Master Link. Id. ¶ 16.

8. Defendant MTA is a public corporation of the Commonwealth of Puerto Rico ascribed to the Department of Transportation and Public Works. It provides ocean transportation of cargo and passengers between mainland Puerto Rico and the

municipalities of Vieques and Culebra. Id. ¶ 6.

9.  MTA was the owner and original signatory to the BSLA for
    FAJARDO II. Id. ¶ 23.

10. On June 26, 2018, Marina PDR and MTA entered into a
    Settlement Agreement where Marina PDR dismissed all claims
    against MTA regarding liability for dockage, storage and
    other fees incurred by Marina PDR. (Docket No. 64).

11. That same day, the Court dismissed Marina PDR's claims
    against MTA via a partial judgment. (Docket No. 66).

Puerto del Rey, Inc. and Bankruptcy Proceedings

12. PDR was owner and operator of Marina Puerto del Rey in
    Fajardo, Puerto Rico up to May 2013. (Docket No. 81 ¶ 1).

13. On December 28, 2012, PDR filed a Chapter 11 bankruptcy
    petition before the U.S. Bankruptcy Court, District of
    Puerto Rico. Id. ¶ 2.

14. Per the May 30, 2013 *Order Confirming the First Amended Joint
    Chapter 11 Plan Proposed by the Debtor, FirstBank Puerto
    Rico, and PBF-TEP Acquisitions, Inc. ("Order Confirming
    Amended Joint Chapter 11 Plan")*, all of PDR's assets,
    including contracts, were purchased by and transferred to
    Putnam Bridge and various other entities including Plaintiff
    (jointly, "the Purchaser"). (Docket Nos. 81 ¶ 4; 88-1 ¶ 5).

15. Regarding the transfer of Purchased Assets, the *Order
    Confirming Amended Joint Chapter 11 Plan* states as follows:

The transfer of the Purchased Assets to the Purchaser (including, without limitation, the transfer of the Affiliate Assets (including, without limitation, the Affiliate Contracts) to the Debtor, the subsequent transfer of the Affiliate Assets (including, without limitation, the Affiliate Contracts) as Purchased Assets to the Purchaser, the assumption by the Debtor of the Assumed Contracts, the assignment by the Debtor to the Purchaser of the Assumed Contracts, and the rejection by the Debtor of any and all Affiliate Contracts or Executory Contracts that do not constitute Assumed Contracts), **is a legal, valid, and effective transfer of the Purchased Assets, and will vest in the Purchaser with all right, title, and interest of the Debtor in and to the Purchased Assets** (including, without limitation, the interest of the Debtor in the Affiliate Assets upon effectuation of the Affiliate Transfer, the assumption by the Debtor of the Assumed Contracts (including the Affiliate Contracts so transferred to the Debtor, and the assignment by the Debtor to the Purchaser of the Assumed Contracts (including, without limitation, the Affiliate Contracts transferred to the Debtor) […] free and clear of all liens, Claims, encumbrances and other interests, except as otherwise specifically provided in the Plan or the Term Sheet, with all such liens, Claims, encumbrances and other interests to attach to the sale proceeds in the same order of priority and **with the same validity and enforceability as they had immediately before the closing of the sale of the Purchased Assets, subject to all defenses thereto.**

<u>Id.</u> at 19 (emphasis added).

16. Among the transferred assets in the "Assumed Contracts Schedule (Filed Under Seal)" filed alongside the Bankruptcy Court's May 30, 2013 Order was ML-PDR BSLA. (Docket Nos. 88-1 ¶ 5; 88-3 at 23).

THE MASTER LINK I BARGE STORAGE

17. On April 22, 2013, ML and PDR entered into a BSLA and a Boatyard Order and Agreement ("Boatyard Order") for the storage of MASTER LINK I at PDR's Fajardo marina (jointly, "ML-PDR BSLA"). (Docket Nos. 83 ¶ 1; 88-1 ¶ 1).

18. Both contracts were signed by Mr. Francisco Berrios ("Mr. Berrios") on behalf of ML. (Docket No. 88-1 ¶ 1).

19. ML and Marina PDR did not sign a BSLA. (Docket No. 81 ¶ 7).

20. The ML-PDR BSLA states in its Terms and Conditions as follows:

> 3. Monthly dockage/storage charges are due (monthly) in advance. All checks must be drawn on U.S. or P.R. banks. Returned checks will carry a service charge. In case of non-payment for 15 days or more, Marina will charge a late fee of 5% and charge account to Owner's credit card. Boats for which the dockage/storage charges are not paid within sixty (60) days of due will incur daily rather than monthly charges until the account is brought up to date.

> 4. If an account is not paid when due, Owner shall be in default under this Agreement. In the event of default or failure by Owner to pay any indebtedness to Marina, Marina shall have the right to secure the boat and/or remove it until all amounts then due are paid in full. Securing the boat shall mean chaining the vessel, or removing same to the land storage facility at the sole risk of the Owner, and at Marina's sole discretion. Owner shall be liable to Marina for any damages Marina may suffer as a result of Owner's default. Unpaid balances will incur in 1.5% monthly interest. Owner grants Marina the right to retain the vessel as guarantee for payment and/or performance by Owner of any obligation under this Agreement.

Id. ¶ 3.

21. ML did not pay MASTER LINK I's monthly storage fee from October 2014 to March 2016. (Docket Nos. 88 ¶ 1; 83 ¶ 6).

22. ML agreed to pay storage fees for MASTER LINK I from March 2016 to March 2017 totaling $15,654.60. (Docket No. 83 ¶ 7).

23. The monthly fee for land storage for MASTER LINK I is $1,170.00, excluding taxes, late fees or interests. Id. ¶ 8.

24. The amounts owed to Marina PDR by ML for the unpaid monthly storage fees for October 2014 to March 2016 are:

> Principal Land Storage Fees 18 months $22,899.24
>
> 1.5% interests on the Balance Due      15,627.96
>
> **TOTAL**                              **$38,527.17**

Id. ¶ 9.

25. ML judicially admitted that it "entered into a Boat Space License Agreement with PDR for the storage of the barge." (Docket Nos. 69 ¶ 17; 88-1 ¶ 3).

26. ML still denied the authenticity of the BSLA and the Boatyard Order. (Docket No. 88-1 ¶ 4).

27. ML paid for MASTER LINK I's storage and even accepted a pre-payment offer from PDR to aid ML in lessening its debt. (Docket Nos. 9; 13; 88-1 ¶ 8).

THE FAJARDO II FERRY STORAGE

28. In 2011, ML was awarded a contract to repair the motor vessel

FAJARDO II, a passenger ferry owned and operated by MTA. (Docket No. 81 ¶ 8).

29. In the first quarter of 2012, MTA requested from PDR a space in the marina to work on and repair FAJARDO II. Id. ¶ 10.

30. ML was not a party to MTA and PDR's BSLA ("the MTA-PDR BSLA"). Id. ¶ 11.

31. While ML was working on FAJARDO II at the marina, it advanced Plaintiff some of MTA's outstanding storage fees on behalf of and to the benefit of MTA. Id. ¶ 13.

32. ML then billed MTA for the storage charges and other fees advanced to Marina PDR. Id. ¶ 14.

33. The contract between Puerto Rico General Services Administration ("GSA") and ML for repair services to FAJARDO II expired on November 11, 2012. Id. ¶ 15.

34. The GSA contract was not extended or renewed. Id. ¶ 16.

35. In mid-June 2014, ML's Mr. Berrios met with Isander Agosto ("Mr. Agosto"), the marina's Boatyard Manager, to discuss FAJARDO II's outstanding storage fees. Id. ¶ 17.

36. On June 26, 2014, Mr. Berrios sent Mr. Agosto a letter stating: (1) ML and GSA's agreement for the repairs of FAJARDO II had expired on November 2012; (2) ML paid Marina PDR for FAJARDO II storage charges (haul out, blocking, lays days, and land storage) and then collected these from MTA; (3) the marina had not invoiced ML for the charges,

and (4) ML would pay the FAJARDO II balance. (Docket Nos. 81 ¶ 18; 88-1 ¶ 11).[2]

37. In said letter, ML did not offer Marina PDR to become the debtor under the MTA-PDR BSLA. (Docket No. 81 ¶ 19).

38. ML requested the invoices relating to FAJARDO II to pay Marina PDR what it owed. (Docket No. 88-1 ¶ 11).

39. ML offered to pay the "balance" of the FAJARDO II overdue fees, but it did not state it was willing to pay the storage fees that would accrue in the future or become the debtor under the MTA-PDR BSLA. (Docket No. 81 ¶¶ 20, 23).

40. In the letter, ML through Mr. Berrios, threatened Marina PDR with legal action if it handed over FAJARDO II to MTA. The purpose behind this was so that ML could obtain payment from ATM to pay Marina PDR for Fajardo II's storage. (Docket No. 88-1 ¶ 12).

41. On September 17, 2014, ML's President Mr. Carlos Morales ("Mr. Morales") met at the marina with Arturo Rodriguez and Victor Cotto of MTA, and with Richard Christiansen, Miguel Muntaner, and Blanca Rodriguez of PDR. (Docket No. 81 ¶21).

42. Mr. Morales told Marina PDR and MTA that ML was willing to pay FAJARDO II's storage charges balance **only if** MTA issued ML a purchase order for the balance and provided

---

[2] Both Marina PDR and ML filed as an exhibit to their motions nearly identical copies of the June 24, 2014 letter. (Docket Nos. 81-9; 88-4). Subsequent references to the same will only cite Docket No. 81-9.

the 2012 charges invoiced by PDR. Id. ¶ 22.

43. Marina PDR did not give notice of its consent to ML becoming the debtor under the FAJARDO II BSLA until after the present litigation had commenced and ML moved to dismiss the FAJARDO II claims due to a lack of consent. Id. ¶ 24.

44. Marina PDR's supposed consent to substituting MTA for Master Link as debtor was made after Master Link had expressly told Marina PDR that it would only pay the vessel's storage if MTA issued purchase orders. Id. ¶ 25.

45. Plaintiff continued to collect FAJARDO II storage from MTA even after Master Link supposedly offered to become obligated under their storage agreement. Id. ¶ 26.

46. FAJARDO II's monthly storage fee was $1,300.05. Id. ¶ 27.

47. Marina PDR accepted payments from Master Link for the storage of FAJARDO II for about five to six years. Id. ¶ 14.

48. Marina PDR sent a letter to ML on January 20, 2017 requesting payment for FAJARDO II's acquired debt. Id. ¶ 17.

### IV.   ANALYSIS

#### A. M/V MASTER LINK I BARGE

##### 1. Marina PDR's Standing

In the present case, ML's MSJ alleges that Marina PDR does not have standing to sue for collection of monies for barge MASTER LINK I because **Marina PDR** was not a party to the April 2013 ML-PDR BSLA. (Docket No. 80 at 2, 6). ML also claims there is no

evidence on record that PDR assigned the debts arising out of an agreement with ML to Marina PDR after the latter became the marina's new operator. Id. at 6.

Conversely, **Marina PDR** states that as the marina's current operator, it has standing to bring the suit because it acquired PDR's assets, including the agreement between ML and PDR, pursuant to the May 30, 2013 *Order Confirming Amended Joint Chapter 11 Plan*. (Docket No. 88 at 4-5). Moreover, Plaintiff avers that this Court may take judicial notice of said order. Id. Lastly, ML posits that all parties with contracts with PDR, including ML, were duly notified of the transfer of assets to Putnam Bridge and other entities such as Marina PDR. Id.

The Court finds that **Marina PDR has standing** to bring this suit against ML for collection of monies as to MASTER LINK I. Moreover, Marina PDR can be considered a "real party in interest" under Fed. R. Civ. P. 17(a) because it is the operator of the marina where MASTER LINK I is being stored (Facts ¶¶ 3-4) and currently shoulders the loss of the unpaid storage fees arising out of the ML-PDR BSLA it acquired alongside other entities in the bankruptcy proceeding (Facts ¶¶ 13-14). *See* Sawyer Bros., Inc. v. Island Transporter, LLC, 887 F.3d 23, 34 (1st Cir. 2018) (citations omitted) ("[W]hen an insurer pays only part of the loss suffered by its insured, the insured remains a real party in interest together with the insurer. […] Sawyer Brothers was thus a real

party in interest because its insurer paid only part of its loss"). Hence, Marina PDR is a party who "possesses the right to be enforced" which is the operative question when analyzing which party may be considered a real party in interest. *See* <u>Marina Mgmt. Servs., Inc. v. Vessel My Girls</u>, 202 F.3d 315, 319 (D.C. Cir. 2000) (quotation omitted); *see also* <u>Bautista Cayman Asset Co. v. Evangelista</u>, 2017 WL 3309685, at *2 (D.P.R. 2017) (citing Fed. R. Civ. P. 17(a)) ("[N]o one disputes that plaintiff, thus, is the only real party in interest when it comes to the collection of defendants' alleged debt.").

Further, the Court **may** take judicial notice of the Bankruptcy Court's *Order Confirming Amended Joint Chapter 11 Plan*. (Docket Nos. 82-2). Fed. R. Evid. Rule 201(b) limits judicial notice and provides that a court may take notice of a fact not subject to reasonable dispute if it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Thus, "courts may take judicial notice of another court's order for the limited purpose of recognizing the judicial act or the subject matter of the litigation." <u>MVM Inc. v. Rodriguez</u>, 568 F. Supp. 2d 158, 164 (D.P.R. 2008) (citation omitted). The Court may also take notice of "other undisputable aspects of those proceedings." <u>Quiñones v. Puerto Rico Elec. Power Auth.</u>, 199 F. Supp. 3d 474, 489 (D.P.R. 2016) (quotation omitted);

see also Southern Cross Overseas Agencies, Inc. v. Wah Kwong
Shipping Group Ltd., 181 F.3d 410, 426 (3d Cir. 1999) (taking
notice of a bankruptcy opinion). Courts **may not** "take as true
another court's finding of facts." Almeida-Leon v. WM Capital
Mgmt., Inc., 2019 WL 2052601, at *6 (D.P.R. 2019).

Just as the Court takes judicial notice of the bankruptcy
court's order, so too may it take notice of the "Assumed Contracts
Schedule (Filed Under Seal)" accompanying the same. (Docket Nos.
88-2 and 88-3). See United States v. Pulliam, 2014 WL 3615776, at
*1 (D. Mont. 2014) ("The Court takes notice of the existence of
the Settlement Agreement, the Bankruptcy Court's Order Approving
Settlement, and the Bankruptcy Court's Order dismissing the
bankruptcy case.") Here, it is an undisputed aspect of the
bankruptcy proceeding that Putnam Bridge, and additional entities
including Plaintiff, acquired all rights and titles over PDR's
assets. (Docket No. 88-2; Facts ¶¶ 13-16). The bankruptcy order
stated that the transfer of the assets is: "**a legal, valid, and
effective transfer of the Purchased Assets, and will vest in the
Purchaser with all right, title, and interest of the Debtor in
and to the Purchased Assets.**" (Fact ¶ 15). It is also undisputed
that the ML-PDR BSLA was one of the contracts listed in subsection
"Boat Slip Licenses" of the "Assumed Contracts Schedule (Filed
Under Seal)." (Fact ¶ 16). See In re Alexander, 524 B.R. 82, 89

(E.D. Va. 2014) ("the court takes judicial notice of the Relief
Order and attendant filings.")

ML judicially admitted that it entered the ML-PDR BSLA. (Fact
¶ 25). ML's SMUF also cited as an uncontroverted fact that PDR
filed a Chapter 11 Bankruptcy petition. (Docket No. 81 ¶¶ 2; Fact
¶ 13). And the SMUF also stated that because of that petition,
Putnam Bridge and Plaintiff, among other entities, purchased PDR's
assets including the MASTER LINK I BSLA. (Docket No. 81 ¶¶ 4, 7;
Facts ¶¶ 14-16). Considering that Plaintiff acquired all rights
and titles over the contracts belonging to PDR via the *Order
Confirming Amended Joint Chapter 11 Plan*, Marina PDR has standing
to sue for collection of monies for MASTER LINK I. (Fact ¶ 13).

### 2. Novation Doctrine

Defendant bears the burden of proof on a novation claim, an
affirmative defense pursuant to Fed. R. Civ. P. 8(c)(1). *See* Web
Servs. Group v. Ramallo Bros. Printing, 336 F.Supp.2d 179, 183
(D.P.R. 2004) (citation omitted). ML did not plead novation as an
affirmative defense in its answer to the *Complaint*. (Docket No. 69
at 4-5). Typically, this would amount to waiver of the defense.
*See* Conjugal P'ship v. Conjugal P'ship, 22 F.3d 391, 400 (1st Cir.
1994). But, there are exceptions such as "where [1] the defendant
asserts it [the defense] without undue delay and the plaintiff is
not unfairly prejudiced by any delay," or where "[2] the
circumstances necessary to establish entitlement to the

affirmative defense did not obtain at the time the answer was filed." O'Brien v. Town of Bellingham, 943 F.3d 514, 528 (1st Cir. 2019) (quotation omitted). Here, Plaintiff was not prejudiced by a failure to plead the defense because novation was addressed in ML's *Motion to Dismiss the Second Amended Complaint* (Docket No. 30), and which was later incorporated by reference into ML'S *Motion to Dismiss Third Amended Complaint* (Docket No. 52). Further, this occurred before the discovery deadline and both parties briefed the novation issue in their respective summary judgment motions. (Docket Nos. 80 and 82). *See* Williams v. Ashland Engineering Corp., 45 F.3d at 593 (1st Cir. 1995) (abrogated on other grounds by Carpenters Local Union No. 26 v. U.S. Fidelity & Guard Co., 215 F.3d 136 (1st Cir. 2000)) (holding that plaintiff was not ambushed by defense where defendant amplified its position before the close of discovery and the parties briefed the issue during summary judgment). Hence, ML can proceed with the novation defense.

There are two types of novation: modificatory and extinctive.[3] *See* Fed. Deposit Ins. Corp. v. Arrillaga-Torrens, 212 F. Supp. 3d 312, 339–40 (D.P.R. 2016); Warner Lambert Co. v. Tribunal Superior, 101 P.R. Dec. 378, 390–91, 1 Offic. Trans. 527, 545–47 (1973). In the first type, "a modificatory novation simply modifies [either

---

[3] Novation is defined as "[t]he act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party. […] A novation may substitute (1) a new obligation between the same parties, (2) a new debtor, or (3) a new creditor." *Novation*, Black's Law Dictionary (11th ed. 2019).

the object or principle condition of an agreement], but does not extinguish, the original agreement." Web Serv. Grp., Ltd., 336 F. Supp. 2d at 182 (quotation omitted). Whereas in the second type, a novation "extinguishes the old obligation and creates a new one." Id. Notably, "**novation is never presumed**" and must be proved "**without any trace of doubt**." Provimi de Puerto Rico, Inc. v. Certified Angus Beef LLC, 2014 WL 12889576, at *11 (D.P.R. 2014) (citation omitted) (emphasis added). It is always "established by the parties' intention," as determined case-by-case. Id.

Puerto Rico jurisprudence recognizes two subtypes of extinctive novation: express or tacit. The first occurs when the parties expressly state their intent to create a new agreement. See Kellogg USA v. B. Fernandez Hermanos, Inc., 2010 WL 376326, at *8 (D.P.R. 2010). The second occurs when there is a total incompatibility between the old and the new agreement. Id.; see also Alvarez v. Amgen Mfg. Ltd., 2017 WL 8948946, at *2 (D.P.R. 2017), report and recommendation adopted in part sub nom. Alvarez v. Amgen Mfg. Ltd., 2017 WL 4122610 (D.P.R. 2017). Under the first subtype, extinctive novation occurs "even when the contractual condition modified is of secondary importance, as long as that is what the parties intended[,] and they have conclusively stated that the prior contract is canceled and substituted by another." Kellogg USA, 2010 WL 376326, at *8. In the second subtype, the new contract and the original one must be incompatible "in all

points." <u>Nieves Domenech v. Dymax Corp.</u>, 952 F. Supp. 57, 62 (D.P.R. 1996) (citation omitted). The change "must be so radical in nature as to make the new and old agreements unable to coexist and to make them mutually excludable." <u>Id.</u> (citation omitted). Changes "that are mainly quantitative in nature do not extinguish" the contract's main obligation, "which remains in effect with all its supplementary and accessory guarantees." <u>Fed. Deposit Ins. Corp.</u>, 212 F. Supp. 3d at 339 (citation omitted). Hence, "quantitative change[s] […] [do] not reflect the will to novate." <u>Santiago-Negron v. Carlos Albizu Univ., Inc.</u>, 2009 WL 2777972, at *5 (D.P.R. 2009) (quotation omitted).

ML **did not** raise a novation defense for ML-PDR BSLA for MASTER LINK I in its MSJ. (Docket No. 80). Instead, it only mentions novation to argue why ML did not become a debtor under the MTA-PDR BSLA for FAJARDO II. <u>Id.</u> at 8-13. ML **did** bring forth the defense in its *Opposition to PSMUF*, where it alleges that the ML-PDR BSLA was "novated by the parties when they agreed to a lower monthly charge." (Docket No. 86 at 7). This allegedly occurred when the parties agreed that the "discount [of $6,114.32] on storage fees was for past and future invoices for the storage of the barge." <u>Id.</u> at 8.

Marina PDR denied that the discount was a novation. (Docket No. 93 at 6). It explains that the "discount was offered as a deal on September 2014 […] [for] Master Link to be able to pay the

minimum amount owed at the time promptly, since it owed almost
$14,285.79 at the time to PDR." (Docket No. 93 at 7; Fact ¶ 27).
Thus, it should not be considered an intent to change the terms of
the ML-PDR BSLA. Id. Plaintiff also avers that no invoice after
2014 includes a discount, which should also indicate that Marina
PDR did not intend to change the storage rate set in the BSLA. Id.

The Court agrees with Marina PDR. First, ML does not state
whether it is relying on an extinctive or modificatory novation.
Second, it fails to: (1) provide evidence of an intent to
extinguish the ML-PDR BSLA; (2) prove an incompatibility between
the BSLA and a new agreement, if one exists at all; or (3) proffer
sufficient evidence of a modification of the ML-PDR BSLA. The
District of Puerto Rico has held that "[t]he party raising the
affirmative defense of novation **has the duty to proffer sufficient
competent evidence of novation**, specifically, evidence of the
contracting parties' express intention or incompatibility of the
two agreements." Sandoval Diaz v. Sandoval Orozco, 296 F. Supp. 2d
122, 127 (D.P.R. 2003) (citation omitted). ML did neither here.
For example, in Ceramic Enterprises, Inc. v. Dexion Inc. the
District of Puerto Rico held that extinctive novation did not occur
since "[c]hanges in the price, duration, and square footage terms
of the lease are not so material as to extinguish the Lease in
favor of a new and separate lease." Ceramic Enterprises, Inc. v.
Dexion Inc., 994 F. Supp. 97, 103 (D.P.R. 1998). Here therefore,

the discount seems to be a mere "quantitative change" which did not extinguish the terms of the BSLA.

Lastly, the Court observes that the original ML-PDR BSLA stated that "[r]ates may be changed from time to time at Marina's [then PDR's] sole discretion." (Docket No. 81-2 at 2 ¶ 1). Hence, any change by PDR to the storage and repair rates, whether a discount or otherwise, would not necessarily novate an existing BSLA. In RentPath, LLC v. CarData Consultants Inc., the District of Georgia held that the original contract between the parties showed that "the parties understood basic modifications to the service price would not create an entirely new agreement." RentPath, LLC v. CarData Consultants Inc., 2016 WL 7888041, at *4 (N.D. Ga. 2016). This because the service agreement in question stated "that fees 'may be amended from time to time[.]'" Id.; see also Entact Servs., LLC v. Rimco, Inc., 526 F. Supp. 2d 213, 223 (D.P.R. 2007) (holding inappropriate the novation theory because "the POS and the Rental Contract do not constitute subsequent agreements. They are both part of an agreement executed by Entact and Rimco in which they stipulated that the rental rate of the equipment provided by Rimco was to be calculated on a daily, weekly and monthly basis."). Thus, even when viewing the facts in the light most favorable to ML and drawing all reasonable inferences in its favor, the novation theory is inapplicable.

3. Authenticity of the April 2013 ML-PDR BSLA

In the present case, ML posits in its *Opposition to PMSUF*
that the ML-PDR BSLA is not authenticated and is inadmissible at
the summary judgment stage, thus denial of the PMSJ is proper.
(Docket No. 86 at 7). Conversely, Plaintiff avers that the BSLA
was properly authenticated via Ms. Marinés Camacho's unsworn
statement filed alongside the PMSUF. (Docket Nos. 83-1; 93 at 2-
6). The Court agrees with Plaintiff. Moreover, it sees no need to
address the authenticity of the BSLA given that ML filed **the same
exhibit** as an exhibit to its SMUF. (Docket Nos. 81-2; 83-1).

In referencing the ML-PDR BSLA in its MSJ and SMUF, ML is
essentially adopting and authenticating it. The same BSLA it now
declares inadmissible with regards to the PMSJ and PSMUF. Defendant
cannot have it both ways. This Court overrules ML's objection to
admission of the ML-PDR BSLA. The District of Wisconsin reached a
similar ruling in Daud v. Nat'l Multiple Sclerosis Society when it
overruled the defendant's objection regarding inadmissibility of
an exhibit filed alongside a summary judgment motion. *See* Daud v.
Nat'l Multiple Sclerosis Soc'y, 2019 WL 3082467, at *4 (W.D. Mo.
2019). The District Court held that "Defendant cannot utilize an
exhibit to support one of its facts, ostensibly representing the
exhibit is admissible, but also argue Plaintiff cannot use the
same exhibit to support of one of her facts because it is
purportedly inadmissible." Id.; *see also* In re Fort Wayne Telsat,

_Inc._, 2009 WL 9073366, at *2 (Bankr. N.D. Ind. 2009) ("[I]t would seem that there should be very little reason for a dispute over admissibility when both [parties] plan to use the same exhibit.") The Court thus **GRANTS** Plaintiff's _Motion for Partial Summary Judgment._ (Docket No. 82).

### B. M/V FAJARDO II

1. <u>Novation and Assumption of Debt Doctrine</u>

The party pleading novation, particularly extinctive novation, has the burden of proving the same. _See_ <u>Sandoval Diaz</u>, 296 F. Supp. 2d at 127. Here, Marina PDR agrees with ML that extinctive novation of the MTA-PDR BSLA did not occur. To wit, it states in its _Reply_ that "Master Link indicates that an extinctive novation did not occur regarding MTA and PDR's agreement. However, the same cannot be said for its argument regarding an assumption of debt." (Docket No. 88 at 7). The Court agrees that no extinctive novation occurred as to the MTA-PDR BSLA given that the record does not show the existence of a contract between ML and Marina PDR which expressly extinguished the MTA-PDR BSLA or was so incompatible with the former that a tacit extinction occurred. _See_ <u>Kellogg USA</u>, 2010 WL 376326, at *8.

This leaves only a modificatory novation. Notably, in its _Reply_ to Plaintiff's MSJ, Marina PDR seems to equate a modificatory novation by substitution of a debtor with an assumption of debt. <u>Id.</u> Although similar, said doctrines differ regarding the consent

required by the creditor for the debtor's substitution. *See* Joglor, LLC v. First Am. Title Ins. Co., 261 F. Supp. 3d 224, 234 (D.P.R. 2016) (quoting Eastern Sands, Inc. v. Roig Commercial Bank, 140 P.R. Dec. 703 (1996)). Regarding novation and a debtor's substitution, the Joglor opinion explained that a modifying novation arises "when a debt is paid off by a third party, this may cause such third party to be subrogated to the rights of the original creditor, in which case the obligation and its guarantees are not extinguished." Id. This modificatory novation "requires certain and positive proof that the creditor had the deliberate purpose of accepting the new debtor and thereby extinguish any cause of action against the original debtor upon the debt." Fed. Deposit Ins. Corp. v. Prann, 694 F. Supp. 1027, 1035 (D.P.R. 1988), aff'd sub nom. Fed. Deposit Ins. Corp. v. Bracero & Rivera, Inc., 895 F.2d 824 (1st Cir. 1990) (citation omitted).

On the other hand, assumption of debt occurs where "the contract through which a third party, with the creditor's consent, takes upon him a preexisting obligation, thus becoming a debtor and releasing the original debtor, while the other elements of the obligations remain unchanged." TCG Innovations Corp., Inc. v. Aspect Software, Inc., 2014 WL 12889597, at *5 (D.P.R. 2014) (quoting Teacher's Annuity v. Soc. de Gananciales, 15 P.R. Offic. Trans. 372, 386 (1984)). In an assumption of debt, the creditor's consent may be implied and does not have to be "expressed in a

certain and positive manner." Fed. Deposit Ins. Corp., 694 F. Supp.
at 1035. Especially given that "'implied consent is always a matter
of intent,' [and] to judge the intention of the contracting
parties' attention 'must principally be paid to [the contracting
parties'] acts, contemporaneous and subsequent to the contract.'"
TCG Innovations Corp., Inc., 2014 WL 12889597, at *5 (quoting P.R.
LAWS ANN. tit. 31, § 3472). The Puerto Rico Supreme Court has
highlighted that *solely* accepting a payment "does not constitute
implied consent." Id. Instead, "acceptance of payment would
doubtlessly constitute implied consent if there is a pattern of
conduct from which the creditor's intent to accept the new debtor
may be inferred." Id. (quotation omitted).

Defendant Master Link avers in its MSJ that it did not become
a debtor under the MTA-PDR BSLA for FAJARDO II neither under
novation nor the assumption of debt doctrines. (Docket No. 80 at
8-15). ML's principal argument concerns a June 24, 2014 letter
("the June 2014 letter") following a meeting between ML and Marina
PDR representatives sent by ML's representative Mr. Berrios to Mr.
Agosto of Marina PDR. The letter stated that: (1) ML is an MTA
contractor for repairing FAJARDO II; (2) ML and GSA's agreement
for the repairs of FAJARDO II had expired on November 2012 and
has not been renewed; (3) ML paid Marina PDR for FAJARDO II
storage charges (*i.e.* haul out, blocking, lays days, and land
storage) for the benefit of MTA and then collected these from

MTA; (4) that the marina had not invoiced ML for those charges, and (5) that Marina would allegedly pay the balance of FAJARADO II. (Docket Nos. 80 at 9; 81-9; Facts ¶¶ 36-40). ML alleges that nothing in the letter indicates that PDR was relieving MTA from its outstanding debt regarding FAJARDO II nor that ML was patently stating that it would substitute MTA and become the new obligor under the MTA-PDR BSLA. (Docket No. 80 at 10-11). Thus, no novation of the BSLA occurred. Id. at 12.

ML also asserts that assumption of debt is inapplicable because there is no agreement between ML and Marina PDR concerning the assumption of MTA's debts by ML. Id. at 14. Moreover, Plaintiff never stopped collection efforts from MTA even after ML supposedly offered to become liable for FAJARDO II's debts. (Docket No. 80; Fact ¶45). This allegedly shows that Marina PDR never treated ML as the sole party liable for FAJARADO II's fees. Thus, no assumption of debt occurred. (Docket No. 80 at 14-15).

Marina PDR avers in its *Reply* that ML has always acted with the intention of being FAJARDO II's representative. (Docket No. 88 at 14). More so considering it paid FAJARDO II's fees for **over five (5) years** since April 2012. (Docket No. 88 at 14; Fact ¶ 47). Thus, based on ML's conduct, the intention to transfer FAJARDO II's obligations to a new debtor were implied and an assumption of debt occurred. (Docket No. 88 at 14). Since there is a genuine

issue of material fact as to the parties' intent and ML's alleged assumption of debt, summary judgment is not proper. Id. at 5-6.

Having considered the evidence presented by the parties, the Court finds that there are issues of material fact which preclude a summary finding of lack of modificatory novation or assumption of debt in this case. The evidence proffered here does not seem to evince that the parties positively intended to substitute ML for MTA in the MTA-PDR BSLA. The parties' conduct, however, could show an intent, implied or otherwise, for ML to assume MTA's debt. Specifically, Defendant's conduct in paying Marina PDR for over five (5) years seems to show an intent by ML to assume MTA's debts with Marina PDR. See Fed. Deposit Ins. Corp. 694 F. Supp. at 1030 (holding that while there was no novatory intent, a creditor tacitly consented to an assumption of debt by a new debtor as evinced by bank documents and evidence of internal transactions which showed that original debtor was exonerated from liability).

Here, it is undisputed that ML was not a part of the MTA-PDR BSLA for FAJARDO II. (Fact ¶ 30). Further, as stated above, there is no evidence on the record of an existing contract between ML and Marina PDR for the vessel. While, the June 2014 letter does not evince an express or implied intent by ML to pay all future debt regarding the storage and repair of FAJARDO II nor an intent for ML to become custodian of FAJARDO II, it does state an intent to pay the current pending balance of the vessel. (Docket No. 81-

9). This after it receives a purchase order from MTA, all the while collecting the amount from MTA. (Docket No. 81-9 at 2-3; Facts ¶¶ 42, 44-45). Notably, this letter was in response to a June 19, 2014 e-mail by Marina PDR stating: "[t]o confirm what was discussed this morning, you will be sending us a document in which Maritime Transportation Authority awards you custody of the Fajardo II vessel." (Docket No. 88-5, certified translation filed at Docket No. 100-1). However, only one other document on record addresses the supposed change in custody. Almost three years after the June 2014 letter, Marina PDR states in an April 10, 2017 letter to ML, that per the terms set forth in the June 2014 letter, "PDR hereby expressly consents to the substitution of Master Link as the new and sole debtor under the referenced account [FAJARDO II's] and agreement. Alternatively, PDR hereby also consents and accepts Master Link's assumption of debts under the referenced account." (Docket No. 88-16). Yet, this alleged consent by Marina PDR only occurred after the suit in the case at bar had been filed. (Fact ¶ 43). No additional evidence was provided by Marina PDR to support this consent to the substitution of MTA for ML.

Thus, while it is undisputed that ML paid FAJARDO II's storage for several years (Fact ¶ 47), there is an ongoing issue of material fact as to whether the parties intended an actual substitution of MTA for ML to occur through assumption of debt. See TCG Innovations Corp., Inc., 2014 WL 12889597, at *6 ("[T]hat

Defendant knowingly agreed to honor the original terms of the agreement and actually paid Plaintiff approximately $12,000.00 per month for over one and a half years could be enough to show that Defendant either assumed Corsidian's debt or that a novation of the contract occurred.") For the Court to definitively determine if assumption of debt occurred, it would have to delve into the parties' intent. And at "this juncture, this Court is disinclined to consider elusive concepts such as motive and intent." Gonzalez v. Hurley Int'l, Inc., 2011 WL 4856454, at *4 (D.P.R. 2011). The Court **DENIES** ML's *Motion for Summary Judgment*. (Docket No. 80). *See* Fin. of Am. Reverse, LLC v. Cancel Marquez, 2019 WL 5866715, at *3 (D.P.R. 2019) ("[s]ummary judgment is inappropriate where there are issues of motive and intent as related to material facts."); Ferrer Marrero v. Misey Rest., Inc., 2019 WL 6833824, at *1 (D.P.R. 2019). Finally, since the Court has yet to determine if ML substituted MTA in the MTA-PDR BSLA and assume its debts under the same, the Court will not address ML's argument that Marina PDR cannot recover twice for the same claim. Id. at 16-17.

   2. Assignment of Rights

   Similarly, the Court is not convinced at this time that an assignment of rights regarding the MTA-PDR BSLA occurred. Under Puerto Rico law, the assignment of a contract or assignment of rights stemming from a contract is "the transfer by one of the contracting parties to a third party, of the exact and integral

position occupied by the former in the assigned contract." <u>Unilever Home & Pers. Care USA v. Puerto Rico Beauty Supply, Inc.</u>, 162 F. App'x 22, 26 (1st Cir. 2006) (quotation omitted). For an effective assignment to occur "**the three interested parties must concur in the act of the assignment**: the party that transfers its position in the contract [the assignor], the assignee party that will acquire it and the obligor, that will be affected by the change of the person with whom he had contracted." <u>Goya de Puerto Rico, Inc. v. Rowland Coffee</u>, 206 F. Supp. 2d 211, 218 (D.P.R. 2002) (quotation omitted) (emphasis added). Here, there remains a dispute regarding whether Marina PDR, MTA, and ML concurred in the formal act of assignment whereby MTA assigned its position in the BSLA to ML. For example, ML's agreement to pay the balance of pending payments for FAJARDO II (Facts ¶¶ 36, 39, 42) does not mean that MTA's duties under the BSLA were automatically assigned to it, nor that it would be responsible for all future fees. *See* <u>Unilever Home & Pers. Care USA</u>, 162 F. App'x at 26–27 (holding that a promise to pay an outstanding debt is not conclusive proof of an assignment and that "a factfinder must sort this out.") Another example of conflicting evidence is that MTA avers it is not responsible for ML's debts with Marina PDR regarding FAJARDO II. (Docket No. 88-19, certified translation at Docket No. 100-7). Yet, the record does not evince that MTA was ever released from its BSLA with Marina PDR. The consent of the obligor, here

Marina PDR, is of essential importance **"because the liberation of the assignor [MTA] as a debtor of the party with whom initially had contracted can only be obtained with [its] will."** Id. (quotation omitted) (emphasis in original); *Cf*. Goya de Puerto Rico, Inc., 206 F.Supp.2d at 219 (finding in motion to dismiss context, that assignment of distribution contract to new owner of brand was sufficiently pled, where plaintiff alleged that buyer would assume seller's obligations to that distributor, the buyer continued to honor all agreements with that distributor, and it started a new relationship with the distributor that lasted over seven months). Hence, at this stage, summary judgment is not proper because the parties have failed to show that there was no triable issue of fact on whether Marina PDR assigned MTA's rights under the BSLA and whether MTA was released from the BSLA.

## V.   CONCLUSION

In accordance with the above, the Court **GRANTS** Plaintiff's *Motion for Partial Summary Judgment* (Docket No. 82) and **DENIES** Defendant's *Motion for Summary Judgment* (Docket No. 80). Judgment shall be entered accordingly upon trial on the claims pertaining to the M/V Fajardo II.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of July 2020.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge